UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JAMIE-LEE A. HASTED, *Individually and as Administratrix of the Estate of Hank B. Lee, Deceased*, <br><br> Plaintiff, <br><br> v. <br><br> UNITED STATES OF AMERICA, <br><br> Defendant. | * <br> * <br> * <br> * <br> * <br> * <br> * <br> Civil Action No. 19-cv-12049-ADB <br> * <br> * <br> * <br> * <br> * <br> * |

**MEMORANDUM AND ORDER
DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

BURROUGHS, D.J.

Plaintiff Jamie-Lee A. Hasted ("Plaintiff") brings this case against the United States of America ("Defendant") pursuant to the Federal Tort Claims Act (the "FTCA"), alleging that Defendant's negligence led to the sudden death of her husband, Hank B. Lee ("Mr. Lee"), while he was a patient at Defendant's Brockton VA Medical Center ("Brockton"). [ECF No. 1 ("Compl.")]. Presently before the Court is Plaintiff's motion for partial summary judgment as to Defendant's liability. [ECF No. 27]. Because the Court finds that there remain genuine issues of material fact regarding Defendant's alleged breach of its duty of care, the motion is DENIED.

**I.   BACKGROUND**

   **A.   Factual Background**

Unless otherwise noted, the following facts are undisputed.[1]

---

[1]The Court draws the facts from Plaintiff's statement of undisputed facts, [ECF No. 26], Defendant's response to Plaintiff's statement of undisputed facts and additional statement of undisputed material facts, [ECF No. 39], and the documents referenced therein.

Mr. Lee was a 34-year-old Marine Corps veteran. [ECF No. 39 at 6 ¶ 1]. At the time of his death, he was married to Plaintiff and the father of four children. [ECF No. 28 at 1]. He arrived at Brockton on February 7, 2017 after being transferred from the Tufts Medical Center's emergency department. [ECF No. 39 at 1 ¶ 1]. The parties dispute the reason for his admittance to Brockton. Plaintiff asserts that Mr. Lee was admitted to Brockton's locked, inpatient psychiatric unit ("the Unit") because he was experiencing suicidal ideation, post-traumatic stress disorder ("PTSD"), traumatic brain injury, and a possible dissociative fugue. [Id. at 2 ¶ 2]. Defendant, pointing to Mr. Lee's medical records, counters that he was admitted due to a conditional voluntary mental health commitment under Massachusetts General Laws. ch.123 §§10–11. [Id. (response)].

Pursuant to the VA Boston Healthcare System policy titled "Maintenance of a Safe and Therapeutic Milieu in Inpatient Mental Health," patients are searched for prohibited contraband before being transported to the Unit. [ECF No. 39 at 7 ¶ 4]. Brockton staff may search any property or area for contraband during admission and a patient's personal belongings will be searched, inventoried, and secured. [Id.]. The screening process also includes asking patients about contraband, obtaining a urine sample and screening, and requiring the patient to change into hospital clothing. [Id. at 7–8 ¶ 7]. Defendant's 30(b)(6) witness testified that this process was followed during Mr. Lee's admission to the Unit. [ECF No. 28-4 at 8:4–25]. There are also random inspections of the Unit to search for contraband using a canine and patients are monitored for signs of illicit substance use. [ECF No. 39 at 8 ¶ 8].

When he was admitted to Brockton, healthcare providers documented Mr. Lee's history of substance abuse, self-harming behaviors, suicidal ideation and suicide attempts, severe PTSD, and panic attacks. [ECF No. 39 at 3 ¶¶ 7, 9 (response)]. Plaintiff contends that during admission

Mr. Lee reported his chronic intermittent thoughts of suicide, while Defendant asserts that Mr. Lee reported that his last suicide attempt was in 2010 and that he denied current suicide plans, intention, or means.  [Id. at 3 ¶ 9].  Although Mr. Lee denied recent use of any substance other than cannabis, he tested positive for cocaine, cannabis, alcohol, and opiates at the time of his admission.  [Id. at 3 ¶ 8].

Mr. Lee remained at Brockton from February 7, 2017 until March 4, 2017, only leaving the facility when he was sent to Good Samaritan Medical Center from February 10 to February 13, 2017 due to chest pain.  [ECF No. 39 at 2 ¶ 3].  Upon returning from the Good Samaritan Medical Center, Mr. Lee was returned to the Unit and kept under "close observation."  [Id. at 2 ¶¶ 4–5].  At Brockton, "close observation" means that the patient is observed by staff every 15 minutes, 24 hours a day.  [Id. at 2 ¶ 6].  On February 13, 2017, Mr. Lee reported that he was suicidal, but that he did not have intent or a plan for suicide.  [Id. at 9 ¶ 13].

By March 2017, Mr. Lee appeared to be making progress and was working on his plans for the future.  [ECF No. 39 at 10–11 ¶¶ 20–22].  March 3, 2017, however, was the anniversary of the day Mr. Lee got injured while serving in Iraq and he reported to medical providers that he was having a difficult day.  [ECF No. 39 at 11 ¶ 23].  At Mr. Lee's request, an inpatient psychiatry medical student and supervising attending psychiatrist met with him at 8:14 a.m. and discussed ways he could manage his PTSD symptoms.  [Id. at 11–12 ¶ 25].  He denied suicidal ideation, but stated he was depressed and would report any suicidal thoughts if he had them. [Id.].  He denied suicidal feelings again when asked around 7:25 p.m. that day.  [Id. at 13 ¶ 30].

On the morning of March 4, 2017, nursing staff noted that Mr. Lee slept well and there was no indication that he was continuing to struggle as he had the prior day.  [ECF No. 39 at 13 ¶ 33].  At 2:09 p.m., Mr. Lee's medical records indicate that a 15-minute check was performed.

[ECF No. 39 at 4 ¶ 11]. He was in the dayroom and appeared calm while watching television. [Id. at 13 ¶ 35]. The next entry in his medical records is a note at 4:50 p.m. stating that a "code blue" had been called, [id. at 5 ¶ 12], after Mr. Lee had been found unresponsive in the dayroom, [id. at 14 ¶ 37]. Mr. Lee was transferred to Good Samaritan Medical Facility and pronounced dead at 5:38 p.m. [Id. at 5 ¶ 13]. The cause of death was acute fentanyl intoxication. [Id. at 5 ¶ 14]. While at Brockton, Mr. Lee was not prescribed fentanyl, nor were other patients in the Unit prescribed fentanyl, so there was no medical reason for fentanyl to be present there. [Id. at 5 ¶¶ 15–17]. In the week prior to his death, Mr. Lee did not have any visitors.[2] [Id. at 6 ¶ 20]. Brockton staff and healthcare providers do not know how Mr. Lee got access to fentanyl. [Id. ¶ 21].

B. **Procedural History**

On October 2, 2019, Plaintiff filed her complaint alleging that Defendant was negligent and failed to provide Mr. Lee with care consistent with the governing standard for a locked, inpatient psychiatric facility. [Compl. ¶¶ 60–63]. Defendant answered the complaint on April 14, 2020. [ECF No. 13]. On May 17, 2021, Plaintiff filed a motion for partial summary judgment on the issue of Defendant's liability. [ECF No. 27]. Defendant opposed the motion on August 6, 2021, [ECF No. 38], and Plaintiff filed her reply on August 20, 2021, [ECF No. 42].[3]

---

[2] For a visitor to access the Unit they need to obtain a pass and sign on and off the Unit. [ECF No. 39 at 6 ¶ 18]. If a visitor does not comply, they are not allowed to enter. [Id. at 6 ¶ 19]. All visitors are educated regarding banned items and staff check all packages brought into the Unit for contraband. [ECF No. 39 at 7 ¶ 5].

[3] Defendant has titled its opposition to Plaintiff's motion as an "Opposition to Plaintiff's Motion for Summary Judgment and Cross-Motion for Judgment in Its Favor," and requests that, in addition to denying Plaintiff's motion, the Court grant it summary judgment and dismiss the case. [ECF No. 38 at 12]. Defendant did not separately move for summary judgment by the deadline for dispositive motions, [ECF Nos. 24, 25 (amended scheduling order)], and its attempt

4

## II. LEGAL STANDARD

Summary judgment is appropriate where the moving party can show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[A]n issue is 'genuine' if it 'may reasonably be resolved in favor of either party.'" Robinson v. Cook, 863 F. Supp. 2d 49, 60 (D. Mass. 2012) (quoting Vineberg v. Bissonnette, 548 F.3d 50, 56 (1st Cir. 2008)). "A fact is material if its resolution might affect the outcome of the case under the controlling law." Cochran v. Quest Software, Inc., 328 F.3d 1, 6 (1st Cir. 2003) (citation omitted). Thus, "[a] genuine issue exists as to such a fact if there is evidence from which a reasonable trier could decide the fact either way." Id. (citation omitted). By invoking summary judgment, "the moving party in effect declares that the evidence is insufficient to support the nonmoving party's case." United States v. Plat 20, Lot 17, Great Harbor Neck, New Shoreham, R.I., 960 F.2d 200, 204 (1st Cir. 1992) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)).

"To succeed in showing that there is no genuine dispute of material fact the moving party must . . . . 'affirmatively produce evidence that negates an essential element of the non-moving party's claim,' or, using 'evidentiary materials already on file . . . demonstrate that the non-moving party will be unable to carry its burden of persuasion at trial.'" Ocasio-Hernández v. Fortuño-Burset, 777 F.3d 1, 4–5 (1st Cir. 2015) (quoting Carmona v. Toledo, 215 F.3d 124, 132 (1st Cir. 2000)). Conversely, "[t]o defeat a properly supported motion for summary judgment, the nonmoving party must establish a trial-worthy issue by presenting enough competent evidence to enable a finding favorable to the nonmoving party." ATC Realty, LLC v. Town of

---

to move for summary judgment via its opposition brief is untimely. Further, the same issues of material fact that preclude summary judgment in Plaintiff's favor also preclude summary judgment in Defendant's favor.

Kingston, N.H., 303 F.3d 91, 94 (1st Cir. 2002) (internal quotation marks and citation omitted). That is, the nonmoving party must set forth specific, material evidence showing that there is "a genuine disagreement as to some material fact." Plat 20, Lot 17, Great Harbor Neck, 960 F.2d at 204 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986)).

In reviewing the record, the Court "must take the evidence in the light most flattering to the party opposing summary judgment, indulging all reasonable inferences in that party's favor." Cochran, 328 F.3d at 6. The First Circuit has noted that this review "is favorable to the nonmoving party, but it does not give him a free pass to trial." Hannon v. Beard, 645 F.3d 45, 48 (1st Cir. 2011). "The factual conflicts upon which he relies must be both genuine and material[,]" Gomez v. Stop & Shop Supermarket Co., 670 F.3d 395, 397 (1st Cir. 2012), and the Court may discount "conclusory allegations, improbable inferences, and unsupported speculation." Cochran, 328 F.3d at 6 (quoting Medina-Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990)).

### III.   DISCUSSION

#### A.   The FTCA

Under the FTCA,

> the district courts, together with the United States District Court for the District of the Canal Zone and the District Court of the Virgin Islands, shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages, accruing on and after January 1, 1945, for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b)(1). Here, the parties do not appear to dispute that the Brockton staff and medical providers were government employees acting within the scope of their employment at the time of Mr. Lee's death. Accordingly, the key question is whether Mr. Lee's death, and

6

Plaintiff's resulting damages, were caused by the Brockton staff's "negligent or wrongful act or omission."

**B.     Negligence**

Massachusetts tort law applies to Plaintiff's negligence claim brought pursuant to the FTCA. [ECF No. 28 at 2; ECF No. 38 at 4]. "To prevail on a negligence claim under Massachusetts law, 'a plaintiff must show by a preponderance of the evidence (1) a legal duty owed by defendant to plaintiff; (2) a breach of that duty; (3) proximate or legal cause; and (4) actual damage or injury.'" Primus v. Galgano, 329 F.3d 236, 241 (1st Cir. 2003) (quoting Heinrich v. Sweet, 308 F.3d 48, 62–63 (1st Cir. 2002)).

The parties appear to generally agree that Defendant owed Mr. Lee a duty of care while he was a patient at Brockton and that, under Massachusetts law that duty, at minimum, required Defendant to protect Mr. Lee from an "unreasonable risk of physical harm." [ECF No. 28 at 3; ECF No. 38 at 5]. Although Defendant does not dispute that it owed a duty of care to Mr. Lee, it does argue that Plaintiff cannot show that it breached that duty or that any of its actions were the proximate cause of Mr. Lee's death. [ECF No. 38 at 5–18]. Plaintiff contends that Defendant breached its duty of care because it (1) allowed fentanyl to enter the Unit where it was consumed by Mr. Lee and (2) did not perform the required 15-minute observation checks of Mr. Lee that could have prevented his death. [ECF No. 28 at 4–7].

       1.     Failure to Prevent Access to Fentanyl

Plaintiff argues that Defendant breached its duty to Mr. Lee because it failed to prevent fentanyl from entering the Unit and then failed to prevent him from ingesting it. [ECF No. 28 at 4–6]. Plaintiff relies on the opinion of her expert, Dr. Steven E. Bruce, who concluded that Defendant's conduct fell below the standard of care by failing to do enough to prevent Mr. Lee's

access to fentanyl and subsequent overdose. [ECF No. 28-6 at 3; ECF No. 42 at 6]. In relevant part, Dr. Bruce opines that:

> I believe within a reasonable degree of medical certainty that the Brockton VAMC treatment of Mr. Lee failed to meet the standard of care. Mr. Lee was in a secure, acute inpatient psychiatric facility. He was not prescribed fentanyl. He should not have had access to any medications he was not prescribed. No contraband fentanyl should have entered the facility. Mr. Lee was on close observations with checks required every 15 minutes, yet the record indicates a gap of nearly three hours prior to Mr. Lee being discovered unresponsive from the last recorded check. There were multiple failures which, if avoided, would have prevented Mr. Lee's death.
>
> Importantly, Mr. Lee was on close observation requiring checks every fifteen minutes. Prior to Mr. Lee's fentanyl overdose, the medical record only contains information from check at 2:09 pm on March 4, 2017. The record indicates that Mr. Lee was found unresponsive with no palpable pulse at approximately 4:50. Had he been checked every fifteen minutes as his specific treatment required, it is probable that the signs and symptoms of fentanyl overdose would have been observable sooner. Additionally, whether the facility failed to inspect for contraband or failed to secure their own supply of prescription medication, it is the responsibility of an acute inpatient psychiatric facility to ensure that no medications which are not prescribed to the patient are accessed by the patient.
>
> It is for the above reasons my opinion is that Mr. Lee's VA healthcare providers violated the standard of care by failing to prevent Mr. Lee's death by fentanyl overdose in an acute inpatient psychiatric facility while he was on close observation.

[ECF No. 28-6 at 3]. Although Dr. Bruce concludes that Defendant breached its duty and that there were "multiple failures," he does not explain what in particular should have been done to prevent Mr. Lee from accessing fentanyl. Hayes v. Douglas Dynamics, Inc., 8 F.3d 88, 92 (1st Cir. 1993) ("Although an expert affidavit need not include details about all of the raw data used to produce a conclusion, or about scientific or other specialized input which might be confusing to a lay person, it must at least include the factual basis and the process of reasoning which makes the conclusion viable. . ."). On the other hand, there is evidence in the record that Defendant had a policy that aimed to prevent the presence of contraband in the Unit, and deposition testimony from Defendant's Rule 30(b)(6) witness suggests that the policy was

8

followed in the normal course and also with Mr. Lee. [ECF No. 28-4 at 8:4–25; ECF No. 39 at 7–8 ¶¶ 4, 7–8].[4] Although it is clear that fentanyl somehow ended up in the Unit and led to a tragic result for Mr. Lee and Plaintiff, there exists a genuine issue of fact as to whether the presence of fentanyl in the Unit is enough to conclude that Defendant breached its duty, especially when evidence suggests that Defendant's policies were followed.

Faced with a lack of specific details regarding Defendant's conduct, Plaintiff also argues that the doctrine of *res ipsa loquitor* applies and therefore the Court should infer that Defendant breached its duty of care. [ECF No. 28 at 5–6].

> The doctrine of *res ipsa loquitur* permits a trier of fact to draw an inference of negligence, in the absence of evidence of breach of duty or causation, in certain limited circumstances. Under the doctrine, a plaintiff may prove negligence, even when he cannot identify the specific breach of duty that caused the accident, if the accident is of the kind "that does not ordinarily happen unless the defendant was negligent in some respect and other responsible causes including the conduct of the plaintiff are sufficiently eliminated by the evidence." Enrich v. Windmere Corp., 616 N.E.2d 1081 (Mass. 1993). There are three conditions necessary for the application of *res ipsa loquitur:* (1) the event must be one that does not ordinarily occur in the absence of negligence; (2) the evidence must sufficiently eliminate the plaintiff's and others' conduct as the cause of the event; and (3) the alleged negligence must fall within the scope of the defendant's duty to the plaintiff. Tolentino v. United Parcel Service, Inc., 2001 WL 92201, at *5 (D. Mass. January

---

[4] Defendant's witness testified as follows:
> Q. Doctor, what steps were taken to prevent Mr. Lee from obtaining illicit drugs, primarily fentanyl, during his hospitalization in February and March of 2017?
> A. All of the veterans on the service are admitted through a -- through our urgent care and as part of the admission process, the veterans are evaluated and their belongings are searched and/or secured off the unit. And the urine tox screens are obtained on the unit. Patients are observed for any signs of mental-status change, which would include monitoring for any indications for illicit-substance use on the unit.
> Q. And what specific steps were taken with regard to Mr. Lee to mitigate his risk of an overdose by contraband substance?
> A. Well, apart from those that I have just mentioned, discussion of his desires to use and his management of distressing psychiatric symptoms was a frequent focus of his treatment, of his therapy on the unit.

[ECF No. 28-4 at 8:4–25].

11, 2001); Edwards v. Boland, 670 N.E.2d 404 (Mass. App. Ct. 1996); RESTATEMENT (SECOND) TORTS § 328D (1965).

Ryba v. LaLancette, 417 F. Supp. 2d 199, 207 (D. Mass. 2006).

According to Plaintiff, because the details surrounding the fentanyl's entrance into the Unit are unknown, the doctrine of *res ipsa loquitor* allows the Court to conclude that Defendant breached its duty because Mr. Lee would not have accessed and ingested the drug unless Defendant was negligent in some respect. [ECF No. 28 at 5–6]. At the outset, the Court notes that "[t]he doctrine of *res ipsa loquitur* is not on its own dispositive of the question of negligence; it merely permits a trier of fact to draw an inference of negligence when certain conditions are met." Tillson v. Odyssey Cruises, No. 08-cv-10997, 2011 WL 309660, at *5–6 (D. Mass. Jan. 27, 2011). Therefore, "[c]ourts have generally been reluctant to grant summary judgment to plaintiffs merely upon demonstration of the predicates for the doctrine's application." Id. (collecting cases). Instead, "[t]he trend has been toward viewing res ipsa loquitur as raising only a permissible inference which merely gets the plaintiff to the jury." Id. (quoting Dan B. Dobbs, Robert E. Keeton & David G. Owen, Prossner And Keeton On Torts, § 40, p. 259 (5th ed. 1984)).

Setting aside the procedural issues with granting Plaintiff summary judgment based on the doctrine, it is not clear that all three conditions are met. While the parties do not dispute that "contraband in a locked mental health inpatient unit is not the kind of occurrence that ordinarily happens," [ECF No. 38 at 15]; see also [ECF No. 28 at 5–6], a reasonable factfinder may conclude that such an occurrence could happen in the absence of Defendant's negligence. For example, in Hirsh v. State of New York, 168 N.E.2d 372 (N.Y. 1960), the New York Court of Appeals overturned the lower court's decision that found a hospital negligent after a patient died of barbiturate poisoning. Like this case, nobody could explain how the patient obtained

10

barbiturates. Id. at 373. The record indicated that, among other precautions, the patient was searched when he was admitted to the hospital and that he was also examined prior to bed each night. Id. Rather than concluding that the hospital was negligent for not instituting more or better procedures, the Hirsh court reasoned that

> [i]f institutions for the mentally ill are required to take all of the precautions contended for in this case, and are to be held liable for such delicate mistakes in judgment, patients would be kept in strait jackets or some other form of strict confinement which would hardly be conducive to recovery.

Id.

Accordingly, taking all the evidence in the non-moving party's favor, a reasonable factfinder may determine that Defendant did not breach its duty even though fentanyl was present in the Unit.

### 2. Failure to Perform 15 Minute Checks

Plaintiff also asserts that Defendant breached its duty because Mr. Lee was on routine observation (i.e., being checked on by staff every 15 minutes), but the medical records show a gap of almost 3 hours between his last observation and when he was found unresponsive. [ECF No. 28 at 7]. Though it is undisputed that there is nothing in the record that provides contemporaneous, written documentation of checks being performed every 15 minutes, Defendant asserts that such checks were taking place. [ECF No. 38 at 7]. In support, it points to the notes on Mr. Lee's medical records that generally state that he was under routine observation, e.g., [ECF No. 38-1 at 73, 78, 85; ECF No. 39 ¶¶ 15, 24, 26, 29, 31, 33–36], and also that the medical report following his death indicates that Mr. Lee was observed "a few minutes" prior to being found unresponsive and appeared to be "fine," [ECF No. 38-1 at 63; ECF No. 38 at 7]. Although it is unclear whether the last observation was made as part of the routine observation procedure, it suggests that Mr. Lee was observed at some point after the last written

11

documentation in his medical records and that there was thus not actually a three-hour gap between medical staff's observations of him.  Plaintiff also has not put forth any evidence to demonstrate that each observation would typically be recorded in the normal course or that a lack of written documentation is definitive proof that the checks did not occur.  Therefore, even assuming that a failure to perform the 15-minute checks would be a breach of Defendant's duty of care, there exists a genuine issue of material fact as to whether the 15-minute checks were performed as required.

### IV. CONCLUSION

Accordingly, because genuine issues of material fact regarding Defendant's breach of its duty remain, Plaintiff has not met her burden at this stage and her motion for partial summary judgment, [ECF No. 27], is <u>DENIED</u>.  The parties are to appear for a status conference before the Court on April 14, 2022 at 9:15 a.m.

**SO ORDERED.**

March 24, 2022                                                                 /s/ Allison D. Burroughs
                                                                                       ALLISON D. BURROUGHS
                                                                                       U.S. DISTRICT JUDGE